**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DON DISHION, individually and on behalf of all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) ) | |
| **vs.** | ) ) | **Case No. 26 C 3149** |
| **POWER SOLUTIONS INTERNATIONAL, INC., DINO XYKIS, and XUN LI,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

This case involves a securities class action brought by Don Dishion against Power Solutions International, Inc., a manufacturer of small engines used in industrial equipment, and two of its executives, Dino Xykis and Xun Li. Three movants seek appointment as lead plaintiff: Donald McBride; the Investor Group (composed of three individual investors, Greg Hochstedler, Dan Morris, and Jeffrey Schwartz); and Shane Andrews. For the reasons below, the Court grants Andrews' motion to serve as lead plaintiff and approves the selection of Bernstein Liebhard LLP as lead class counsel and Cohen Milstein Sellers & Toll PLLC as liaison counsel. The Court denies the remaining motions.

**Background**

Power Solutions International, Inc., manufactures and sells small engines used in industrial equipment and micro-power systems. Its stock is traded on the NASDAQ

(National Association of Securities Dealers Automated Quotations).  In 2025, Power Solutions sought new clients in the data center industry for which it would provide onsite power generation solutions.  In May 2025, it framed this decision to investors as prioritization of "higher growth, higher-margin markets."  Compl. ¶ 20.  In August 2025, it again described "strong demand" and "our deliberate strategic focus on higher-growth sectors such as data centers."  *Id.* ¶ 21.  In September 2025, Power Solutions described its "Power Systems business" as offering "superior margins[.]"  *Id.* ¶ 23.  As of September 23, 2025, Power Solutions stock closed at $115.78 per share, the highest price in the class period alleged in the complaint, which runs from May 8, 2025 to March 2, 2026.  *Id.* ¶ 43.

In November 2025, Power Solutions released its third quarter financial disclosures, reporting a 5 percent year-over-year decline in its gross margin due to "temporary inefficiencies related to our accelerated production ramp-up" for "key data center product lines."  *Id.* ¶ 25.  Its stock price fell about 20 percent the following day, closing at $65.69 per share.  *Id.* ¶ 27.  In March 2026, Power Solutions released its fourth quarter and full year 2025 financial results.  Its gross margin had declined 8 percent year-over-year for the same cited reason.  *Id.* ¶ 29.  The price of Power Solutions stock fell about 28 percent the next day, closing at $60.91.  *Id.* ¶ 30.

Don Dishion owns Power Solutions securities.  On March 20, 2026, Dishion sued Power Solutions, its Chief Executive Officer, Dino Xykis, and its Chief Financial Officer, Xun Li, on behalf of a class of those who purchased Power Solutions securities during the class period.  The lawsuit alleges that Power Solutions failed to disclose material adverse facts or made false statements.  Specifically, "(1) the Company overstated its

ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) the Company understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related 'inefficiencies'; and (3) . . . as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis." *Id.* ¶ 7. The complaint alleges that the class suffered losses because of these misleading statements and omissions and the resulting decline in market value of Power Solutions stock.

The complaint includes two claims. First, the plaintiffs allege that all defendants violated section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 promulgated thereunder. Second, the plaintiffs allege that the individual defendants violated section 20(a) of the Act. The plaintiffs seek certification of a class under Federal Rule of Civil Procedure 23 and an award of compensatory damages.

The price of Power Solutions stock continued to fall after this lawsuit was filed. On May 11, 2026, the company made another financial disclosure in which it noted elevated production costs and softer demand. *See* McBride Reply to Mots. for Appointment as Lead Pl. at 4 & n.4. From May 11 to May 12, 2026, Power Solutions stock fell from $62.45 per share to $38.00 per share. *Id.* The per-share price of Power Solutions stock has been below $40 since June 22, 2026, and it dropped to $25.28 on July 29. *See* Yahoo! Finance, NASDAQ Real Time Price: Power Solutions International, https://finance.yahoo.com/quote/PSIX/history/ (last visited July 29, 2026).

3

The Court has before it three motions for appointment as lead plaintiff, filed by Donald McBride, Shane Andrews, and the Investor Group, a group of three putative class members. McBride is a Texas resident employed as a senior business analyst in the healthcare industry; he has eleven years of investing experience. The Investor Group comprises Greg Hochstedler, Dan Morris, and Jeffrey Schwartz. Hochstedler lives in Indiana, works as a contractor, and has thirty years of investment experience. Schwartz lives in Illinois, works in banking, and has forty years of investment experience. Morris lives in Alabama, works in finance, and has fifty years of investment experience. Finally, Andrews, the last individual moving for appointment, resides in Washington, is a fleet foreman at a power company, and has been investing for over five years. Dishion, the named plaintiff, also filed and then withdrew a motion seeking appointment as lead counsel. *See* dkt. 20, 54.

## Discussion

The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4, *et seq.*, specifies the procedures for private class actions brought under the Exchange Act. First, the plaintiff in a PLSRA class action must publish, "in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class" of the pending action and that, within sixty days of publication of the notice, "any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A)(i).

At step two, the district court must determine the "most adequate plaintiff" among the movants. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The statute establishes a "[r]ebuttable presumption" that

4

the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that--

>> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

>> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

>> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). In other words, "the district court must 'adopt a presumption that the most adequate plaintiff' is the movant with the largest financial interest who 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *In re Mersho*, 6 F.4th 891, 899 (9th Cir. 2021) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). If a movant has the largest financial interest but "does not satisfy the Rule 23 requirements, the district court must then look to the movant with the next largest losses and repeat the inquiry. At this step, the process is not adversarial, so the Rule 23 determination should be based on only the movant's pleadings and declarations." *Id.* (citing *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002)).

Once the district court has identified a presumptive most adequate plaintiff, at the third step, it may address "[r]ebuttal evidence":

The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--

>> (aa) will not fairly and adequately protect the interests of the class; or

>> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). On its initial examination of the Rule 23 factors, the district court relies upon the "presumptive lead plaintiff's complaint and sworn

5

certification." *In re Cavanaugh*, 306 F.3d at 730. But at the rebuttal stage, "the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy." *Id.* "The standard of proof for rebutting the presumption of adequacy under the PSLRA is preponderance of the evidence." *In re Crain Walnut Shelling, LP*, 175 F.4th 1069, 1073 (9th Cir. 2026) (holding that district court erred by applying "genuine and serious doubt" standard). "Competing movants must convince the district court that the presumptive lead plaintiff would not be adequate, not merely that the district court was wrong in determining that the prima facie elements of adequacy were met." *In re Mersho*, 6 F.4th at 901.

## A.     Timing of motions

The PSLRA requires motions to be the lead plaintiff of a PSLRA class action to be made within sixty days of the publication of notice of the pending action. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). The three movants all filed timely motions on the same day.

## B.     Largest financial interest

The PSLRA states that the "most adequate plaintiff" is the one who, along with satisfying other criteria, "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(bb). One of Congress's objectives of the "largest financial interest" provision was "increase[ing] the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff.'" H.R. Conf. Rep. 104–369, at 34 (1995). But the statute does not instruct courts on exactly how to measure the financial interest of prospective lead plaintiffs.

6

In assessing the size of the financial interest of prospective plaintiffs, courts consider:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2012 WL 1339678, at *4 (N.D. Ill. Apr. 18, 2012) (quoting *Lax v. First Merch. Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001) (adopting the *Lax* factors).[1]

The fourth factor, the approximate losses suffered, is the most important factor and often the only one discussed. *See Chandler v. Ulta Beauty, Inc.*, No. 18 C 1577, 2018 WL 3141763, at *3 (N.D. Ill. June 26, 2018) (collecting cases); *Maeshiro v. Yatsen Holding Ltd.*, No. 22 C 8165, 2023 WL 4684106, at *5 (S.D.N.Y. July 21, 2023) ("[W]hen courts rely on *Lax/Olsten* factors other than the largest financial loss, it is typically because the LIFO[2] losses among competing movants are 'roughly equivalent.'" (quoting

---

[1] "[A] few courts employing the same test [from *Lax*] attribute it to a later Eastern District of New York case entitled *In re Olsten Corp. Sec. Litig.*, and call it the *Olsten* test or *Olsten* factors." 7 Newberg and Rubenstein on Class Actions § 22:42 (6th ed.) (citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D. N.Y. 1998), *opinion adhered to on reconsideration*, 181 F.R.D. 218 (E.D.N.Y. 1998)). Other courts refer to the *Lax* factors or *Lax-Olsten* factors. *See, e.g.*, *Hospira*, 2012 WL 1339678, at *5 n.4.

[2] There are two main accounting methodologies for assessing loss, namely, FIFO (first in, first out) and LIFO (last in, first out). FIFO assumes that the securities purchased at the earliest date are sold first, and LIFO assumes that the securities last are sold first. *See Hospira*, 2012 WL 1339678 at *4. "[C]ourts in this district and others have preferred LIFO over FIFO as the appropriate method to calculate losses for purposes of

7

*Cortina v. Anavex Life Scis. Corp.*, No. 15 C 10162, 2016 WL 1337305, at *1 (S.D.N.Y. Apr. 5, 2016))); *Takara Trust v. Molex, Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005) ("[M]ost courts simply determine which potential lead plaintiff has suffered the greatest total losses[.]").

In their motions and further briefing, the movants assert the following losses:

- McBride:
    - Motion: $59,948.32
    - Reply: $55,113 (recalculated using longer class period ending on May 12, 2026)
- Investor Group: $47,744.11[3]
- Andrews: $31,858

Andrews objects to McBride's claimed loss amount, arguing that he should have calculated his losses according to the PSLRA's damages cap, which would place his losses at $23,661.59. In response, McBride disagrees with Andrews' calculation but revises his calculation of his loss to $55,113 using a longer class period.

### 1. Lookback price

Andrews contends that financial interest must be calculated using the PSLRA's damages cap, which McBride failed to apply. McBride objects to use of the cap for the

---

appointment [of] a lead plaintiff in a securities fraud case." *Id.* at *5. All three movants in this case employ the LIFO approach.

[3] Andrews contends that the Investor Group omitted a sale of shares by one member and that the Group's loss is actually $45,050.32. Andrews Resp. to Mots. for Appointment as Lead Pl. at 4 n.2. Although that miscalculation may have some bearing on adequacy, it is immaterial to the largest financial loss calculation given that the movants' losses are separated by more than a few thousand dollars.

purposes of selecting a lead plaintiff.

The PSLRA provision limiting damages states that

> [i]n any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1) ["beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," 15 U.S.C. § 78u-4(e)(1)], the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

15 U.S.C. § 78u-4(e)(2). The mean trading price, also referred to as the lookback price, is "an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period referred to in paragraph (1)." 15 U.S.C. § 78u-4(e)(3).

Under this provision, a court applying the PSLRA "'does not calculate damages based on the single day decline in price, but instead allows the security an opportunity to recover'" over a period of time of either ninety days, 15 U.S.C. § 78u-4(e)(1), or, if fewer than ninety days have passed between the disclosure and the sale, over the time between the disclosure and the security transaction, 15 U.S.C. § 78u-4(e)(2). *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (quoting *In re Veritas Software Corp. Sec. Litig.,* 496 F.3d 962, 967 n.3 (9th Cir. 2007)). "Congress imposed this limitation because it believed that '[c]alculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages.'" *Id.* (quoting S. Rep. No. 104–98, at 20 (1995)).

The PSLRA's cap limits damages; it is not expressly linked to the determination

of the largest financial interest for purposes of appointing the plaintiff.  *See* 15 U.S.C. §

78u-4(a)(3)(B)(iii)(I).  Most courts have held that the lookback price applies, but in some

of these cases the parties agreed on the issue.  *See Ishak v. WM Tech., Inc.*, No. 24 C

08959, 2025 WL 791270, at *4 (C.D. Cal. Mar. 11, 2025) (applying the lookback price,

which parties also used to calculate largest financial interest); *City of Omaha Police &*

*Firefighters Ret. Sys. v. Cognyte Software Ltd.*, No. 23 C 1769, 2023 WL 6458930, at *7

& n.3 (S.D.N.Y. Oct. 4, 2023) (explaining that use of the lookback price "for estimating

losses [to select a lead plaintiff] has been approved in this district when not objected to

because of the PSLRA's 90-day lookback period for calculating damages"); *Foley v.*

*Transocean Ltd.*, 272 F.R.D. 126, 130 (S.D.N.Y. 2011) ("We agree with the courts that

have concluded that the PSLRA's 90–day 'lookback period,' which governs the

calculation of damages, should apply to estimating losses in determining the

presumptive lead plaintiff, at least in the absence of any credible argument that a

different calculation method should apply."); *In re Gen. Elec. Sec. Litig.*, No. 09 C 1951,

2009 WL 2259502, at *5, (S.D.N.Y. July 29, 2009) (using section 78u-4(e)(1) to

calculate losses even though movant objected); *In re eSpeed, Inc. Sec. Litig.*, 232

F.R.D. 95, 102 (S.D.N.Y. 2005) (using section 78u-4(e)(1) to calculate losses); *Olsen v.*

*New York Cmty. Bancorp*, 233 F.R.D. 101, 106 & n.5 (E.D.N.Y. 2005) (same).

A minority of courts have held that the lookback price applies only to damages

and not to the determination of the largest financial interest to select a lead plaintiff.

*See, e.g.*, *In re Ribozyme Pharms., Inc. Sec. Litig.*, 192 F.R.D. 656, 661 (D. Colo. 2000)

(holding that "[d]amages is a term of art and a technical matter to be established by

experts.  The lead plaintiff provision in the PSLRA does not use the term 'damages' but

10

instead, 'largest financial interest.'"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.5 (S.D.N.Y. 2008) (rejecting use of ninety-day mean trading price because "§ 78u–4(e)(1) addresses the PSLRA's limitation on damages, not the methodology for determining a proposed lead plaintiff's financial interest in the relief sought"). *But see In re Williams Sec. Litig.*, No. 02 C 72, 2002 WL 32153476, at *5 (N.D. Okla. July 8, 2002) ("The Court does not consider *Ribozyme*'s analysis persuasive in light of the number of district courts relying upon the 90–day average trading price in comparing claimed losses" to determine most adequate plaintiff).

The Court agrees with the courts that have held that the lookback price should be employed in calculating the largest financial interest for purposes of appointing the lead plaintiff. In the Court's view, it's a matter of logic and common sense: it makes no sense to consider damages that a plaintiff is legally barred from recovering in determining his financial interest in the litigation. Logically, the "largest financial interest in the relief sought by the class" is the largest *recoverable* financial interest, not than the largest interest by another means of calculation. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Losses calculated at variance from the statutory damages cap are not appropriately considered "relief sought by the class" as the PSLRA uses that term. *See id.* The rationale behind the "largest financial interest" rule is that the plaintiff with the biggest stake has the greatest incentive to litigate vigorously and protect the interests of the class. This rationale is undermined if the size of the lead plaintiff's financial stake is determined in a way that departs from the PLSRA's damages measure. It is also worth observing that Congress's basis for employing the lookback period to determine damages applies equally to the calculation of the largest financial interest. If a plaintiff's

11

damages should not be inflated based on a single-day decline of the stock price immediately after a corrective disclosure, neither should a plaintiff's financial interest for the purposes of lead plaintiff selection. *See Acticon*, 692 F.3d at 39.

The final corrective disclosure in this case occurred on March 2, 2026, and McBride's sale occurred on May 12, 2026. Applying the mean trading price between these dates, Andrews calculates McBride's losses at $23,661.59.[4] McBride does not dispute the accuracy of that calculation if the mean trading price for that period is used.

### 2. Class period

McBride argues that if the Court uses the lookback price, it should not use the one proposed by Andrews because the class period is likely to be extended through May 12, 2026, when another drop in the price of Power Solutions stock occurred. The class period as alleged in the complaint ends on March 2, 2026. On May 11, 2026, Power Solutions stock closed at $62.45 per share. Power Solutions issued a disclosure on that date, which McBride presents as similar in content to the March 2 disclosure described in the complaint. On May 12, 2026, the price of Power Solutions stock fell sharply, closing at $38.00 per share. *See* Yahoo! Finance, NASDAQ Real Time Price: Power Solutions International, https://finance.yahoo.com/quote/PSIX/history/ (last visited July 29, 2026). McBride says that a lookback period beginning on May 12, 2026, which he anticipates as the end of the class period in a future amended complaint, and running until the date his motion was filed, June 19, is approximately $40. Using that price, McBride calculates his loss at $55,113.

---

[4] Two members of the Investor Group also applied the mean trading price in calculating losses, unlike McBride. Dkt. 26-1.

In a case involving two consolidated PSLRA actions with complaints alleging different class periods, Judge Cummings joined the majority of courts in holding that the longer of the two periods should apply. *See Munch v. Sprout Soc., Inc.*, No. 24 C 3867, 2024 WL 4753734, at *4 (N.D. Ill. Nov. 12, 2024) (quoting *Ragan v. AppHarvest, Inc.*, No. 21 C 7985, 2021 WL 5909116, at *7 (S.D.N.Y. Dec. 3, 2021) (collecting cases)); *Hedick v. Kraft Heinz Co.*, No. 19 C 1339, 2019 WL 4958238, at *5 (N.D. Ill. Oct. 8, 2019) ("For the purpose of calculating losses in determining the proper lead plaintiff in securities class actions, courts use the most inclusive class period."). "[T]he longer class period encompasses more potential class members and damages[,]" which is appropriate in considering the facts in the light most favorable to the plaintiffs. *Hom v. Vale, S.A.*, No. 16 C 658, 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016).

In these cases, however, courts considered competing complaints alleging different class periods. *See also In re Boeing Co. Aircraft Sec. Litig.*, No. 19 C 2394, 2019 WL 6052399, at *2 (N.D. Ill. Nov. 15, 2019) (considering class periods in two operative complaints to assess largest financial interest). In the present case, by contrast, there is only one complaint on file, and it alleges a shorter class period. What McBride offers is a prediction that the lead plaintiff will ultimately file an amended complaint seeking a longer class period. But before filing his motion for appointment as lead plaintiff on May 19, McBride could have filed a separate action alleging a class period that extended until May 12. He did not do so.

The Court cannot appropriately consider McBride's proposed extended class period with no timely-filed complaint alleging that class period. The PSLRA permits putative class members to move to serve as lead plaintiff "not later than 60 days after

13

the date on which the notice [advising purported class members of the pendency of the action] is published." 15 U.S.C.A. § 78u–4(a)(3)(A)(i)(II). Courts have concluded that for the "purpose of calculating losses of competing lead plaintiffs the Class Period cannot be altered or corrected after the expiration of the 60-day notice period under the PSLRA." *Hedick*, 2019 WL 4958238, at *5. "The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed." *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 619 (S.D.N.Y. 2015) (quoting *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)); *Singer v. Nicor, Inc.*, No. 02 C 5168, 2002 WL 31356419, at *3 (N.D. Ill. Oct. 17, 2002) (citing *Telxon* and holding that court could not consider amended financial loss calculations presented after the sixty-day filing deadline).[5] This does not mean that the class period cannot later be extended via an amended complaint; rather, it simply means that a court may not choose a lead plaintiff based on an extended class period absent from any complaint and proposed after the sixty-day deadline for filing lead plaintiff motions.

Applying the lookback price but maintaining the class period defined in the complaint, McBride's losses are $23,661.59, compared to the Investor Group's losses of $47,744.11 and Andrews's losses of $31,858. Accordingly, the Investor Group has the

---

[5] The Court notes that the PSLRA also appears to require courts to both "consider" motions for appointment of lead plaintiff and "appoint" a lead plaintiff within ninety days after notice is published. 15 U.S.C. § 78u–4(a)(3)(B)(i). Notice was published on March 20, 2026, *see* dkt. 26-2, so the Court has, unfortunately, exceeded this deadline. The Court is ruling on the motion a little over a week after it held an in-person oral argument involving a number of out-of-town counsel.

14

largest financial interest among the three movants.[6]

## C.      Rule 23 requirements

The Investor Group, the movant with the largest financial loss, is a group of three individuals.  The PSLRA permits appointment of a group of individuals as lead plaintiff. The statute states that a court "shall appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]"  15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added).  And the PSLRA defines the most adequate plaintiff as "the person *or group* of persons that" fulfills the criteria of 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added). But the statute does not place any special requirements on groups, laying out uniform criteria for selecting the most adequate plaintiff that apply to groups and individuals alike.

The movant with the largest financial interest is presumptively the most adequate plaintiff if that party "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).  Under Rule 23, class certification is appropriate when

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "The typicality and adequacy elements are the relevant factors to the appointment of a lead plaintiff."  *Chandler*, 2018 WL 3141763, at *5; *In re Cendant*

---

[6] Because McBride's losses are not the largest among the movants, he is not the presumptive most adequate lead plaintiff, so the Court need not address Andrews' argument that McBride is an inadequate lead plaintiff because of several typos in his brief and his failure to use the lookback price in his calculations.

*Corp. Litig.*, 264 F.3d at 263. The question is "whether that movant has made a prima facie showing of adequacy and typicality" and, at this stage, "the process is not adversarial, so the Rule 23 determination should be based on only the movant's pleadings and declarations." *In re Mersho*, 6 F.4th at 899; *In re Cendant*, 264 F.3d at 264. "A proposed plaintiff group has the burden of showing that aggregation is appropriate." *Nakamura v. BRF S.A.*, No. 18 C 2213, 2018 WL 3217412, at *3 (S.D.N.Y. July 2, 2018).

The "adequate representation inquiry consists of two parts: (1) the adequacy of the [movant or movants] as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011); *In re Mersho*, 6 F.4th at 899–900.

Courts appropriately have concerns about the adequacy of a lead plaintiff group if the group was assembled by attorneys seeking appointment as lead counsel.[7] "If the

---

[7] The Third and Ninth Circuits discuss aggregation of losses through the lens of Rule 23. *See In re Cendant*, 264 F.3d at 265–66; *In re Mersho*, 6 F.4th at 901. Courts in this district have considered aggregation at various points of the PSLRA analysis. *Compare Hospira*, 2012 WL 1339678, at *6–7 (analyzing aggregation in calculating largest financial interest), *with Chandler*, 2018 WL 3141763, at *5–6 (analyzing whether opposing movants rebutted presumption of adequacy based on aggregation). Courts in the Southern and Eastern Districts of New York more often assess aggregation in discussing largest financial interest. *See, e.g., Evangelista v. Late Stage Asset Mgmt., LLC*, 784 F. Supp. 3d 542 (E.D.N.Y. 2025); *May v. Barclays PLC*, No. 23 C 2583, 2023 WL 5950689, at *8 (S.D.N.Y. Sept. 13, 2023). The Court follows the Third and Ninth Circuits in assessing aggregation as part of Rule 23 adequacy rather than in considering which plaintiff had the largest losses. *See Palm Tran, Inc. - Amalgamated Transit Union Loc. 1577 Pension Plan v. Emergent Biosolutions Inc.*, No. 21 C 1189, 2021 WL 6072812, at *5 (D. Md. Dec. 23, 2021) ("[A]lthough there are examples of district courts disqualifying so-called 'artificial groups' from appointment as lead plaintiffs, the most appropriate timing for such analysis is under the Rule 23 adequacy analysis rather than when determining the movants' financial interest in the litigation.")

court determines that the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff, the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class." *In re Cendant*, 264 F.3d at 266. "Many district courts have considered" factors relating to how a group was formed and its plans to cooperate "as part of their adequacy analysis at step two [of the PSLRA framework] because it may indicate that members may not work together well to vigorously prosecute the litigation or they might not be able to control counsel[.]" *In re Mersho*, 6 F.4th at 901.

Some courts have held that a group of individuals or funds lacking a prior relationship and united by counsel may not serve as the lead plaintiff. *See In re Cendant*, 264 F.3d at 266–67 (collecting cases); *Azad v. Jenner*, No. 24 C 9768, 2025 WL 383846, at *1 n.1 (C.D. Cal. Jan. 31, 2025) ("Although the Ninth Circuit has not addressed whether unrelated plaintiffs may aggregate their claims to collectively become the presumptive lead plaintiff, most courts have held that they may not."); *In re Cloudera, Inc. Sec. Litig.*, No. 19 C 3221, 2019 WL 6842021, at *6 (N.D. Cal. Dec. 16, 2019) ("[C]ourts have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims[.]" (quoting *Eichenholtz v. Verifone Holdings, Inc.*, No. 07 C 6140, 2008 WL 3925289, at *7 (N.D. Cal. Aug. 22, 2008))); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (declining to appoint as lead plaintiff "an artifice cobbled together by

---

(collecting cases). That said, the result in this case would not differ even if the placement of the analysis were different.

cooperating counsel for the obvious purpose" of qualifying as lead plaintiff).

Although the Seventh Circuit has not considered when a group of unrelated investors is an adequate lead plaintiff under the PSLRA, in district courts nationwide, "the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships." *See Chandler*, 2018 WL 3141763, at *5 (quoting *Bang v. Acura Pharm., Inc.*, No. 10 C 5757, 2011 WL 91099, at *2 (N.D. Ill. Jan. 11, 2011)). Most courts "have adopted an intermediate approach, allowing unrelated plaintiffs to join together as a group on [a] 'case-by-case basis,' so long as the 'grouping would best serve the class.'" *May v. Barclays PLC*, No. 23 C 2583, 2023 WL 5950689, at *9 (S.D.N.Y. Sept. 13, 2023) (quoting *Elstein v. Net1 UEPS Techs., Inc.*, No. 13 C 9100, 2014 WL 3687277, at *1 (S.D.N.Y. July 23, 2014)).

Several factors are relevant in determining whether a group fulfills Rule 23's adequacy requirement: 1) the relationship between members of the group and counsel, including evidence of bad faith or gamesmanship; 2) the size of the group; and 3) whether the group "will be able to function cohesively and to effectively manage the litigation apart from their lawyers[.]" *Varghese*, 589 F. Supp. 2d at 392.

First, "the extent of the prior relationships and/or connection between the members of a movant group" and evidence that the group was formed by counsel to create a qualifying lead plaintiff may "properly enter into the calculus of whether that group would 'fairly and adequately protect the interests of the class[.]'" *In re Cendant*, 264 F.3d at 266 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)); *see Peters v. Jinkosolar Holding Co.*, No. 11 C 7133, 2012 WL 946875, at *7 (S.D.N.Y. Mar. 19, 2012).

In addition, courts must assess the size of a group, as "[a]t some point, a group

18

becomes too large for its members to operate effectively as a single unit." *In re Cendant*, 264 F.3d at 267; *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 478 n.2 (5th Cir. 2001) ("[T]he Securities and Exchange Commission has taken the position that a group of investors appointed to serve as lead plaintiffs ordinarily should comprise no more than three to five persons.").

Finally, "there must be some evidence that the members of the group will act collectively and separately from their lawyers[.]" *In re Tarragon Corp. Sec. Litig.*, No. 07 C 7972, 2007 WL 4302732, at *2 (S.D.N.Y. Dec. 6, 2007). Courts assess whether

> the group will be able to function cohesively, which can include evidence regarding 'why the individual members chose to work as a group; how the group intends to function collectively, including how they plan to communicate; the protocol the group will use to address disagreements; background information regarding individual members of the group; and the members' willingness to accept the role and responsibilities of lead plaintiff.'

*Peters*, 2012 WL 946875, at *7 (quoting *Goldstein v. Puda Coal, Inc.*, No. 11 C 2598, 2011 WL 6075861, at *6 (S.D.N.Y. Dec. 6, 2011)); *see Varghese*, 589 F. Supp. 2d at 392 (listing factors for evaluating cohesiveness: "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa").

The size of the Investor Group, at three members, does not raise concerns about the members' ability to communicate or act cohesively. *See Peters*, 2012 WL 946875, at *7 ("[A] group comprising five or fewer members is appropriate."). But based on the Investor Group's declaration and supplemental declaration, and without considering the arguments of opposing movants, the Group has not made a prima facie showing of adequacy. Specifically, under the *Varghese* factors, the Group has not made a prima

19

facie showing that it "will be able to function cohesively and to effectively manage the litigation apart from their lawyers[.]"  *Varghese*, 589 F. Supp. 2d at 392.

First, the declarations lack any information on how the three investors from different states (Alabama, Illinois, and Indiana) became acquainted, the length of their relationship, or whether and how they have communicated independently of their counsel.  *See Evangelista v. Late Stage Asset Mgmt., LLC*, 784 F. Supp. 3d 542, 551 (E.D.N.Y. 2025) (holding that appointment of group was inappropriate where "[n]othing in the record supports a finding that the members of the Investor Group knew or communicated with each other before seeking lead plaintiff status in this action."). Although a lack of prelitigation relationship is not dispositive, this factor weighs against the Group's adequacy.

Second, the members of the Group do not explain their involvement in the litigation in any detail, aside from their decision to jointly move for appointment as lead plaintiff:  "[w]e each determined that we could maximize the Class's recovery by pooling our respective resources and experience by jointly seeking appointment as Co-Lead Plaintiffs.  After reviewing the allegations pleaded in the complaint, and in consultation with our counsel, we agreed to proceed together[.]"  Investor Group Mot. for Appointment as Lead Pl., Ex. D, Joint Decl. ¶ 11.  Given the early stage of the litigation, however, the lack of actual consultation among the group's members is not a matter of great concern.  *See May*, 2023 WL 5950689, at *10 ("the Court would not necessarily expect the group members to have had lengthy conference calls or meetings at this point of the litigation").

The third factor is where the Group fails to meet its burden to make a prima facie

20

showing.  Specifically, the Group provides no detail regarding the members' plans for cooperation and resolving conflict.  They explain that "[w]e have discussed this case with our counsel" and "will communicate with our counsel—and with each other separately from our attorneys."  Joint Decl. ¶¶ 5, 10.  And they "anticipate arriving at joint decisions consensually."  *Id.* ¶12.  These vague statements fall considerably short of the level of detail provided by groups that have successfully moved for appointment as lead plaintiff.  *See, e.g.*, *Khan v. Lockheed Martin Corp.*, No. 25 C 06197, 2025 WL 2992513, at *2 (S.D.N.Y. Oct. 24, 2025) (holding that group of pension funds was proper lead plaintiff as their declaration "sets forth a plan for exercising joint-decision-making and collaboration, which involves advance review of filings, quarterly conference calls, and dedicated staff at each fund to review major filings," and group had already "convened a joint conference call to discuss the case"); *May*, 2023 WL 5950689, at *10 (holding that group losses could be aggregated where group agreed to monthly Monday conference calls, and decisions "on a one-person, one-vote majority basis, when a quorum is present"); *McCracken v. Edwards Lifesciences Corp.*, No. 13 C 1463, 2014 WL 12694135, at *4 (C.D. Cal. Jan. 8, 2014) (concluding group was adequate as declaration described plans for "regular joint conference calls with counsel, short-notice phone and email communication, and the designation of representatives to attend proceedings, depositions, settlement mediations, and hearings").

The Group's reference to consensual decision-making, Joint Decl. ¶ 12, is rather cursory, and the members' declarations do not reflect that the Group is "focused on the issues of cooperation and [have] demonstrated an understanding of the need for cooperation on an ongoing basis[.]"  *May*, 2023 WL 5950689, at *10 (quoting *In re*

*Sequans Commc'ns S.A. Sec. Litig*, 289 F. Supp. 3d 416, 424 (E.D.N.Y. 2018)).

"[B]oilerplate assurances" do not carry the Group's burden to make a prima facie

showing that it "'will be able to effectively manage the litigation.'" *Evangelista*, 784 F.

Supp. 3d at 551 (quoting *Jakobsen v. Aphria, Inc.*, No. 18 C 11376, 2019 WL 1522598,

at *3 (S.D.N.Y. Mar. 27, 2019)); *Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*, No. 24 C 4566,

2024 WL 5279156, at *2 (C.D. Cal. Oct. 24, 2024), *reconsideration denied*, No. 24 C

04566, 2025 WL 29449 (C.D. Cal. Jan. 2, 2025) (holding that group was inadequate

where joint declaration stated that they had communication procedures in place and

would confer as necessary without "specific, substantive information on how they will

jointly manage the case"); *In re Cloudera*, 2019 WL 6842021, at *7 (holding that group

was inadequate under Rule 23 where it "provided no detail whatsoever about any

decisionmaking process"); *Cohen v. Luckin Coffee Inc.*, 20 C 01293, 2020 WL 3127808,

at *4 (S.D.N.Y. June 12, 2020) (declining lead plaintiff motion of group that stated

members would "consult with each other and our counsel as we deem necessary to

fulfill our fiduciary obligations to the class"). In sum, the Group has not made a prima

facie "showing that they will be able to work cohesively for the benefit of the class."

*Evangelista*, 784 F. Supp. 3d at 551 (quoting *Jakobsen*, 2019 WL 1522598, at *3).

The fourth factor points to some extent in favor of the adequacy of the Group.

Each member has been investing for decades and likely has some level of

sophistication. But courts typically refer to *institutional* investors, not individuals, as

sophisticated. *See, e.g.*, *Hedick*, 2019 WL 4958238, at *7; *Khan*, 2025 WL 2992513, at

*2.

Fifth and finally, the Group appears to have been chosen by counsel. "[T]o enjoy

22

the rebuttable presumption that" the group is the most adequate plaintiff because of the size of their losses, "there must be some evidence that the members of the group will act collectively and separately from their lawyers." *Hedick*, 2019 WL 4958238, at *7 (quoting *In re Tarragon*, 2007 WL 4302732, at *2). At oral argument, the Group's counsel explained that each Group member contacted counsel first, and counsel then assembled the Group. Although the threshold for a prima facie showing is low, neither the Group's declaration nor the supplemental declaration from counsel reflect that the Group has even spoken without counsel. Investor Group Reply, Rosen Decl. ¶¶ 2–3 (explaining that counsel and Group spoke prior to filing their motion). *See In re Cloudera*, 2019 WL 6842021, at *7 (declining to appoint as lead plaintiff a group "connected by nothing more than 'one joint call prior to filing the motion for appointment'" (quoting *Isaacs v. Musk*, No. 18 C 4865, 2018 WL 6182753, at *7 (N.D. Cal. Nov. 27, 2018)); *Evangelista*, 784 F. Supp. 3d at 552 (drawing the inference that counsel selected members of investor group based on a press release soliciting plaintiffs for the action and a lack of record evidence that the plaintiffs choose counsel); *Takata v. Riot Blockchain, Inc.*, No. 18 C 2293, 2018 WL 5801379, at *5 (D.N.J. Nov. 6, 2018) (declining presumptive lead plaintiff status for two groups of investors, both of which appeared to have never spoken without counsel, as this raises "serious concerns regarding how these Plaintiffs will monitor their proposed counsel such that they can adequately represent the class") (collecting cases).

The Investor Group is positioned differently from other groups of individuals who have convinced courts to aggregate their losses. *See Chandler*, 2018 WL 3141763, at *6 (aggregating losses of three relatives and one individual who had no pre-litigation

relationship with the family because the three relatives had higher losses than other movants and the group submitted adequate declaration).  In several cases, groups joined together after each filed separate motions for appointment as lead plaintiff and observed they had similar losses, but that is not the situation here.  *See, e.g.*, *Sokolow v. LJM Funds Mgmt., Ltd.*, No. 18 C 1039, 2018 WL 3141814, at *4–5 (N.D. Ill. June 26, 2018) (aggregating losses of several family members and two investment advisor groups based on detailed declaration explaining why parties sought joint appointment and in part because "[t]he combination of institutional and individual investors with a significant financial interest in this case serves to protect the interests of the class.").  Courts have also noted that groups are unlikely to be lawyer-driven when one of the members has the largest loss of all lead plaintiff movants.  *See, e.g.*, *Koffsmon v. Green Dot Corp.*, No. 19 C 10701, 2021 WL 3473975, at *3 (C.D. Cal. Aug. 6, 2021) (noting that "[i]n many such cases" where courts have appointed groups lacking a pre-litigation relationship as lead plaintiff, "courts have based their approval upon the fact that one individual member of the proposed group, even standing alone, had a greater financial interest than any other proposed lead plaintiff"); *Peters*, 2012 WL 946875, at *8 (aggregating losses among four member group formed "with the assistance (if not at the instigation) of counsel" because the losses of three of the four individuals were the highest of any individual, indicating group was not formed to acquire lead plaintiff status); *DeLuca v. Instadose Pharma Corp.*, No. 21 C 675, 2022 WL 3020417, at *4 (E.D. Va. July 29, 2022) (collecting cases); *see also In re Mersho*, 6 F.4th at 901 n.3 (reversing district court decision that group was inadequate in part because each group member had larger stake than the appointed plaintiff).

24

The Court concludes that the Group has not made a prima facie showing of adequacy. Although its three members are experienced individual investors, the Group has not shown that it has met without counsel or considered how to make group decisions and resolve disagreements. The Group thus has not shown that it will adequately supervise counsel and adequately represent the interests of the class. For this reason, the Court need not consider whether the Group has made a prima facie showing of typicality.

Given the Court's finding, it "must . . . look to the movant with the next largest losses and repeat the inquiry[.]" *In re Mersho*, 6 F.4th at 899. Andrews has the next largest financial interest in relief at $31,858.

As explained earlier, Rule 23 requires examination of "(1) the adequacy of the [movant or movants] as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez*, 649 F.3d at 592; *In re Mersho*, 6 F.4th at 899–900. There is no indication that Andrews' interests are adverse to the class, nor have the other movants objected to Bernstein Liebhard LLP, Andrews' choice of lead class counsel, or Cohen Milstein Sellers & Toll PLLC, Andrews' chosen liaison (local) counsel.

A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (cleaned up) (quoting *Oshana v.*

*Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)).  Andrews' claim is, like that of the class, based on his purchase of Power Solutions securities during the class period at prices claimed to be inflated by Power Solutions' alleged misrepresentations and omissions.  Andrews' claim meets the typicality requirement.

In sum, the Court finds that Andrews fulfills the requirements of 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc) and is therefore presumed to be the "most adequate plaintiff."

**D.      Rebuttal evidence**

The Court next must evaluate any evidence that Andrews "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

At a hearing on the motions for appointment as lead plaintiff, McBride raised the fact that Andrews held no Power Solutions shares at the time of the November 2025 disclosure, so his damages rest solely on the March 2026 disclosure.  By contrast, McBride held Power Solutions shares throughout the class period.  But no movant made this argument in their briefs or presented authority holding that a lead plaintiff must have suffered losses based on each partial disclosure, and "[a]rguments first raised at oral argument are waived" or forfeited.  *Mitchell v. Durham Enters., Inc.*, 99 F.4th 978, 989 (7th Cir. 2024).

**E.      Lead counsel**

"The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's

decisions as to counsel selection and counsel retention[.]" *In re Cendant*, 264 F.3d at 276. Courts "should not disturb the lead plaintiff's choice of class counsel unless necessary to protect the interests of the class." *Hedick*, 2019 WL 4958238, at *11.

Andrews seeks appointment of Bernstein Liebhard as lead class counsel and Cohen Milstein as liaison counsel. Bernstein Liebhard has, according to Andrews' motion, been appointed lead counsel in at least twelve PSLRA actions since 2019. Andrews Mot. for Appointment as Lead Pl. at 8. Andrews lists recoveries by the firm totaling nearly $1 billion. *See id.* Cohen Milstein also has meaningful experience with PSLRA actions. *See id.*, Ex. E, Gilden Decl. The Court approves Andrews' choice of lead and liaison counsel.

## Conclusion

The Court grants Andrews' motion [dkt. 28] to serve as lead plaintiff in this case. The Court also approves the selection of Bernstein Liebhard LLP as lead counsel and Cohen Milstein Sellers & Toll PLLC as liaison counsel. The remaining motions [dkt. 16 and 24] are denied. The case is set for a telephonic status hearing at 9:10 AM on 8/6/2026. Andrews should be prepared to address whether he will file an amended complaint and to suggest a proposed filing deadline. The following call-in number will be used for the hearing: 650-479-3207; access code 2305-915-8729.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 30, 2026

27